NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| PARAMOUNT RESIDENTIAL MORTGAGE GROUP, INC., <br><br> Plaintiff, <br><br> v. <br><br> NATIONWIDE MORTGAGE BANKERS, INC., <br><br> Defendant. | Civil Action No. 22-4656 (ZNQ) (RLS) <br><br> **OPINION** |

QURAISHI, District Judge

**THIS MATTER** comes before the Court upon a Motion to Dismiss for Lack of Jurisdiction filed by Defendant Nationwide Mortgage Bankers, Inc. ("Defendant"). ("Motion", ECF No. 11.) Defendant filed a Moving Brief in support of its Motion. ("Moving Br.", ECF No. 11-3.) Plaintiff Paramount Residential Mortgage Group, Inc. ("Plaintiff") filed an Opposition to Defendant's Motion ("Opp'n", at 12) to which Defendant replied ("Reply", ECF No. 13.)

The Court has carefully considered the parties' submissions and decides the Motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, the Court will DENY Plaintiff's Motion to Dismiss.

I.      BACKGROUND AND PROCEDURAL HISTORY

Plaintiff initiated the instant action on July 20, 2022, by filing its Complaint. (ECF No. 1.) On October 3, 2022, Plaintiff filed an Amended Complaint—the operative Complaint in this

matter. ("Am. Compl.", ECF No. 9.)  The Amended Complaint generally alleges damages arising

from Defendant's misappropriation of Plaintiff's employees and its trade secrets. (*Id.* ¶ 1.)

Specifically, the Amended Complaint alleges that Defendant's purported business success

is directly derived from stealing from its competition—namely, from misappropriating Plaintiff's

employees and trade secrets. (*Id.*)  Plaintiff is a California corporation and a leading lender,

providing mortgage products to customers in nearly every state through its 282 branch offices

located around the country, and a direct competitor of Defendant. (*Id.* ¶¶ 2, 7.)  Plaintiff is in the

business of making home mortgage and home equity loans ("Core Business"). (*Id.* ¶ 15.)  The

Core Business is conducted through Plaintiff's employees, who work in Plaintiff's offices

nationwide. (*Id.* ¶ 16.)  In order to obtain loans from Plaintiff, customers, applicants, and

borrowers must provide their private, personal financial information such as credit scores, baking

history and information, net worth, tax returns, compensation information, and current

employment, among other sensitive information ("Personal Financial Information") so that

Plaintiff can determine the creditworthiness of its customers, applicants, and borrowers. (*Id.* ¶¶ 17,

19.)  Customers, applicants, and borrowers expect that when they provide Plaintiff with their

Personal Financial Information, it will be safeguarded and protected and used only by Plaintiff to

help provide a loan. (*Id.* ¶ 21.)  To successfully operate Plaintiff's Core Business, Plaintiff relies

upon and uses confidential and proprietary information and trade secrets ("Confidential

Information") which include Personal Financial Information, loan-to-value ratios of properties,

operating, capital, and budgeting information, vendor accounts, account numbers, passwords, and

codes among other confidential information. (*Id.* ¶¶ 22–23.)  This Confidential Information exists

in hard copy format that resides in files in Plaintiff's secured offices, and in ESI format that resides

in Plaintiff's secure computers and related information technology systems. (*Id.* ¶ 26.)

Several former Plaintiff-employees that were later recruited to Defendant were assigned password-protected, Plaintiff-owned computers and/or given access to Plaintiff's computer systems in order to perform their duties that was completely unaccusable to competitors. (*Id.* ¶¶ 27–29.) Plaintiff's Core Business would suffer if its Confidential Information were disclosed to and exploited for competitive advantage by one of its competitors. (*Id.* ¶ 35.) To ensure the protection of the confidential information and its trade secrets, Plaintiff's employees each executed an Employee Confidentiality, Non-Solicitation, and Inventions Assignment Agreement ("Restrictive Covenants Agreement"). (*Id.* ¶ 42.) In their Restrictive Covenants Agreement, former employees made specific promises to Plaintiff regarding their obligations and duties to protect Plaintiff's Confidential Information and trade secrets; Plaintiff's goodwill with its employees and its assembled workforce; and Plaintiff's goodwill with its customers. (*Id.* ¶ 43) (citing Pl. Ex A. "Heister Restrictive Covenant Agreement", at 1; Ex. B, "Wampler Restrictive Covenant Agreement", at 1.) Furthermore, former employees "promised [Plaintiff] that they would protect and not exploit or misappropriate [Plaintiff's] Trade Secrets, which are defined to include the Confidential Information." (*Id.* ¶ 45) (citing Exs. A and B, at 4–5.) The former employees also promised that "all of the Company's Trade Secrets and Confidential Information shall forever be maintained in confidence by Employee and used by Employee only to such extent as may be necessary in the ordinary course of performing services for the Company under this Agreement." (*Id.* ¶ 46) (citing Exs. A and B, at 6.) Former employees also promised that they would not solicit Plaintiff's clients in order to divert their mortgage business away from Plaintiff nor recruit employees to leave Plaintiff or seek alternative employment at a competitor. (*Id.* ¶¶ 48–49) (citing Exs. A and B, at 7–11.) Defendant "was well aware that each of former P[laintiff] employees owed the aforementioned contractual obligations to [Plaintiff]." (*Id.* ¶ 51.) Despite its

3

alleged knowledge of former employee's contractual obligations, Defendant utilized the influence and authority of former-executives Bob Wampler ("Wampler") and Joe Heister ("Heister") while still employed by Plaintiff to recruit the former-Plaintiff employees, and then encouraging and enabling the former employees to violate their duty of loyalty and post-employment contractual duties to Plaintiff.  (*Id.* ¶ 52.)

Through its onboarding process, Defendant orchestrated the resignation of dozens of former Plaintiff-employees by sending Defendant e-mail accounts and business cards to the former Plaintiff-employees, while they were working for and employed by Plaintiff and providing assistance through Defendant's licensing department to transfer Plaintiff's employees' licenses while they were still employed by Plaintiff.  (*Id.* ¶¶ 53–54.)  Defendant encouraged former employees to breach their contractual obligations to Plaintiff through monetary incentives and back-end protection in the form of indemnification from damage awards, penalties, or judgments, if Plaintiff were to succeed in litigation against them.  (*Id.* ¶¶ 55–56.)

Defendant relied upon the recruitment of Heister and Wampler to solicit other employees to leave Plaintiff for Defendant.  (*Id.* ¶¶ 58–60.)  In the weeks leading up to final execution, Heister, with the encouragement and support of Defendant, visited many former employees to solicit them and obtain final buy-in on the plot to steal Plaintiff's Confidential Information and use it on behalf of Defendant.  (*Id.* ¶ 61.)  Before the former employees submitted their resignations, "they received step-by-step instructions on how to copy and transfer their entire Outlook Email Account, including all of their folders, calendars and emails containing extensive Confidential Information, to an external hard drive so that they would continue to have uninterrupted access to P[laintiff]'s Confidential Information as soon as they commenced employment with [Defendant].  These instructions were followed and executed by former employees to copy and transfer Confidential

Information to [Defendant]." (*Id.* ¶ 62.)  As part of the resignation process, Wampler directed the former employees to back up and synchronize their computers to Plaintiff's corporate information technology system, to ensure that that they would have access to and would be able to misappropriate all of the most recent and updated Confidential Information in the hours before they stopped working for Plaintiff.  (*Id.* ¶ 63.)

By the time the former employees resigned and moved to Defendant corporation, Defendant had amassed a considerable collection of Plaintiff's Confidential Information.  (*Id.* ¶ 72.)  Plaintiff alleges that even before resigning from Plaintiff, the former employees began working for Defendant.  (*Id.* ¶ 76.)  "In a single day, [Defendant] executed an unlawful raid of thirty-five [of Plaintiff's] employees that was coordinated to steal not only the employees, but also the branch offices they operated, the confidential and trade secret information they had access to, the customers they serviced, and, ultimately, the profits they generated." (*Id.* ¶ 3.)  By May 2022, Defendant hired a total of forty-one of Plaintiff's employees despite Plaintiff's demand that Defendant end its misconduct.  (*Id.* ¶¶ 4–5.)  Defendant "conducted its raid with the full knowledge that the Former [Plaintiff's] Employees owed legal and contractual obligations to [Plaintiff] both during and after their employment with [Plaintiff]." (*Id.* ¶ 6.)  Despite a cease and desist letter, Defendant continued to poach Plaintiff's employees.  (*Id.* ¶¶ 84, 88.)

## II.   LEGAL STANDARD

### A.   RULE 12(B)(6)

Under Fed. R. Civ. P. 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the

complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quotations omitted).  Under such a standard, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "[A] complaint must do more than allege the plaintiff's entitlement to relief.  A complaint has to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

However, Rule 12(b)(6) only requires a "short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555.  The complaint must include "enough factual matter (taken as true) to suggest the required element.  This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips*, 515 F.3d at 234 (citation and quotations omitted); *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) ("[A] claimant does not have to set out in detail the facts upon which he bases his claim.  The pleading standard is not akin to a probability requirement; to survive a motion to dismiss, a complaint merely has to state a plausible claim for relief." (citation and quotations omitted)).

In sum, under the current pleading regime, when a court considers a dismissal motion, three sequential steps must be taken: first, "it must take note of the elements the plaintiff must plead to state a claim." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quotations omitted).  Next, the court "should identify allegations that, because they are no more than

conclusions, are not entitled to the assumption of truth." *Id*. (quotations omitted). Lastly, "when there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id*. (quotations and brackets omitted).

**B.      RULE 12(B)(1)**

Federal District Courts retain original jurisdiction over civil actions between "citizens of different States" where the matter in controversy "exceeds the sum or value of $75,000." 28 U.S.C. § 1332. This statute has been interpreted to mean that "no plaintiff [may] be a citizen of the same state as any defendant." *Zambelli Fireworks Mfg. Co., Inc. v. Wood*, 592 F.3d 412, 419 (3d Cir. 2010). The general rule is that "citizenship of the parties is to be determined with reference to the facts as they existed at the time of filing." *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 569-70 (2004). For diversity jurisdiction, the party asserting jurisdiction carries the burden of establishing diversity of citizenship. *McCann v. Newman Irrevocable Tr.*, 458 F.3d 281, 286 (3d Cir. 2006) (citations omitted).

At any time, a defendant may move to dismiss for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1). *See* Fed. R. Civ. P. 12(b)(1), (h)(3). The Court may treat a party's motion as either a facial or factual challenge to the court's jurisdiction. *Dickerson v. Bank of America, N.A.*, Civ. No. 12-03922, 2013 WL 1163483, at *1 (D.N.J. March 19, 2013). Typically, "[a] motion to dismiss ... for lack of subject matter jurisdiction made prior to the filing of the defendant's answer is a facial challenge to the complaint." *Bennett v. Atlantic City*, 288 F. Supp. 2d 675, 678 (D.N.J. 2003) (citations omitted). "A facial 12(b)(1) challenge, which attacks the complaint on its face without contesting its alleged facts, is like a 12(b)(6) motion in requiring the court to 'consider the allegations of the complaint as true.'" *Hartig Drug Co. v. Senju Pharm. Co.*,

836 F.3d 261, 268 (3d Cir. 2016) (quoting *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006)).  As such, district courts "must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000) (citing *Mortensen v. First Fed. Sav. and Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)).  If the Complaint survives a facial challenge and the defendant then mounts a factual challenge, "the plaintiff is entitled to limited discovery for the purpose of establishing that complete diversity exists." *Lincoln Benefit Life Co. v. AEI Life, LLC*, 800 F.3d 99, 102 (3d Cir. 2015).

III.   **DISCUSSION**

A.   **SUBJECT MATTER JURISDICTION**

Defendant first argues that the Complaint must be dismissed for lack of subject matter jurisdiction because it has neither pled that the amount in controversy exceeds $75,000 nor established federal question jurisdiction.  To support its argument, Defendant argues that the $3,000,000 loss in annual revenue asserted is simply a speculation of possible future damages which would be lost had those employees remained with Plaintiff, but not enough to establish diversity jurisdiction.  Defendant further argues that "federal question jurisdiction is lacking because Plaintiff fails to allege sufficient facts to sustain a claim under either of the federal statutes that the Complaint cites." (Moving Br. at 1.)  The Court disagrees.  As explained in further detail below, Plaintiff has sufficiently alleged a violation of the United States Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*, and of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.* which establishes federal question jurisdiction.  *See Growth Horizons, Inc. v. Delaware County, Pa.*, 983 F.2d 1277, 1281 (3d Cir. 1993) (finding federal question jurisdiction "where a plaintiff … makes a non-frivolous allegation that . . . the defendant's conduct violated a federal

statute"); *Bluebeard's Castle, Inc. v. Government of the Virgin Islands*, 321 F.3d 394, 402 (3d Cir. 2003) (finding federal question jurisdiction where the plaintiff's complaint alleged a violation of a federal statute). Defendant argues that the case should be dismissed for lack of jurisdiction. However, because the Court has determined that it has federal question jurisdiction over this suit, it need not address diversity jurisdiction. Thus, the Court finds it has original jurisdiction over this case pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

**B.    DTSA & NJTSA**

Counts I–IV of the Complaint allege Misappropriation and Threatened Misappropriation of Trade Secrets in violation of the DTSA and the New Jersey Uniform Trade Secrets Act ("NJTSA"). Defendant argues that even if the Court has subject matter jurisdiction, Plaintiff has nevertheless failed to sufficiently plead a cause of action. (Moving Br. at 13–16.) Specifically, Defendant argues that the Complaint fails to allege that trade secrets were misappropriated because Plaintiff has failed to identify protectable trade secrets and no specifics as to which trade secrets were misappropriated. (*Id.* at 14–15, 19.) Plaintiff, on the other hand, correctly notes that client lists and client accounts have long been accorded protection as a trade secret. (Opp'n at 10.)

The DTSA and NJTSA require a plaintiff to show "(1) the existence of a trade secret, defined broadly as information with independent economic value that the owner has taken reasonable measures to keep secret, and (2) misappropriation of that secret, defined as the knowing improper acquisition and use or disclosure of the secret." *Par Pharm., Inc. v. QuVa Pharma, Inc.*, 764 Fed. App'x 273, 278 (3d Cir. 2019). "[T]he analysis under [the] DTSA folds into that of [the] NJTSA." *Austar Int'l Ltd. v. AustarPharma LLC*, 425 F. Supp. 3d 336, 355 (D.N.J. 2019). The Court therefore considers the two claims together.

9

To prevail on a claim for misappropriation of trade secrets under DTSA and NJTSA, a plaintiff must first establish the existence of a trade secret. 18 U.S.C. §§ 1836(b)(1), 1839(3), (5); *see also Par Pharm., Inc.*, 764 F. App'x at 278 (applying the identical New Jersey Trade Secrets Act). The DTSA defines a "trade secret" as "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes." 18 U.S.C. § 1839(3). The subject matter of a particular trade secret must be secret. *Baxter Healthcare Corp. v. HQ Specialty Pharma Corp.*, 157 F. Supp. 3d 407, 424 (D.N.J. 2016) "In other words, matters of public knowledge or information completely disclosed by marketed goods cannot qualify as trade secrets." *Id.*

Plaintiff includes a laundry list of Personal Financial and Confidential Information that make up its trade secrets that were ultimately misappropriated by Defendant. This information from customers, applicants, and borrowers includes: Credit and FICO scores, banking history and information, retirement accounts, savings and checking accounts; investment and brokerage accounts, real estate and other investment assets, net worth; and, tax returns and related documentation and filings, personal debt, credit cards, loans and other financial relationships, work and income history, current employment, current wage, salary and compensation (Am. Compl. ¶ 17), vendor accounts, account numbers and account access passwords and codes, information regarding the strengths, weaknesses, historic and trending productivity, proper incentivization and compensation history of employees in the same offices and region, the price and value of real estate sought by customers, applicants and borrowers, the loan-to-value ratios of properties; the names of customers and their contact coordinates, marketing, financial and business data, reports, spreadsheets and presentations, operating, capital and budgeting information, and the use of

computer systems and technologies that enable Plaintiff's employees to access electronically stored information through networked and remote computers (*id.* ¶ 23). Plaintiff also alleges that all of this information was stored in its computer system that were password-protected, could not be accessed by competitors such as Defendant, and made continued significant reinvestments into its information technology, computers, networks, servers, and systems to ensure that this information was protected, safe, and secure. (*Id.* ¶¶ 28–31.)

New Jersey state and federal courts have consistently held that critical business information such as client lists, sensitive and confidential customer information, loan application forms and documents, business data compilations, methods, techniques, and plans are protectable trade secrets. *See Lamorte Burns Co. v. Walters*, 770 A.2d 1158, 1166 (2001) ("In New Jersey, customer lists of service business have been afforded protection as trade secrets."); *see also Corporate Synergies Grp., LLC v. Andrews*, Civ. No. 18-13381, 2019 WL 3780098, at *6 (D.N.J. Aug. 12, 2019) ("Customer lists, pricing information, and marketing techniques constitute trade secrets under New Jersey law and the DTSA."); *Trading Partners Collaboration, LLC v. Kantor*, Civ. No. 09-0823, 2009 WL 1653130, at *15 (D.N.J. June 9, 2009). More specifically, courts have found that customer lists including information on borrowers qualify as a trade secret. *See Freedom Funding Grp. v. The Freedom Funding Grp. LLC*, Civ. No. 20-18404, 2022 WL 3681281, at *35 (D.N.J. Aug. 25, 2022) (in case involving dispute between two lending companies, the court found that "Plaintiff's customer lists and information qualify as trade secrets"). Because Plaintiff has pled critical business information that was appropriately protected from its competitors, it has sufficiently pled a protectable trade secret.

After sufficiently pleading a trade secret, Plaintiff must next sufficiently plead misappropriation. Misappropriation is defined in the DTSA to include "[1] 'acquisition of a trade

11

secret of another by a person who knows or has reason to know that the trade secret was acquired

by improper means' or [2] 'disclosure or use of a trade secret of another without express or implied

consent' in specified circumstances." *Bramshill Invs., LLC v. Pullen*, Civ. No. 19-18288, 2020

WL 4581827, at *3 (D.N.J. Aug. 10, 2020); N.J.S.A. § 56:15-2.  "Improper means" is defined

under the DTSA as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty

to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6).  Taken

together, the DTSA "contemplates three theories of liability: (1) acquisition, (2) disclosure, or (3)

use." *Bramshill*, 2020 WL 4581827, at *3.

At the motion to dismiss stage, a plaintiff is not required to make specific allegations

regarding a defendant's use or disclosure of trade secrets to state a prima facie claim of

misappropriation.  *Id.* (citing *Chubb INA Holdings Inc. v. Chang*, Civ. No. 16-2354, 2017 WL

499682, at *10 (D.N.J. Feb. 7, 2017); *see also Inventiv Health Consulting, Inc. v. Atkinson*, Civ.

No. 18-12560, 2019 WL 6522742, at *5 (D.N.J. Dec. 4, 2019) (recognizing "that information

concerning Defendant[']s alleged use of the trade secret may, at this juncture, be solely within the

Defendant's knowledge").  Here, Plaintiff alleges that Defendant operated a competing company

(Am. Compl. ¶ 2) and used Plaintiff's former-executives to obtain and use its trade secrets even

though it was aware of the former-executive's contractual obligations to Plaintiff (*id*. ¶¶ 52–63).

*See Bramshill*, 2020 WL 4581827, at *3 (holding that the plaintiff sufficiently pled a

misappropriation of trade secrets claim after the plaintiff alleged that the defendant emailed client

lists to a competing business).  Accordingly, the Court finds that Plaintiff has sufficiently pled

Misappropriation and Threatened Misappropriation of Trade Secrets in violation of the DTSA and

NJTSA. Defendant's Motion to Dismiss Counts I–IV of the Complaint will be denied.

### C.      COMPUTER FRAUD AND ABUSE ACT ("CFAA")

Count V of the Complaint alleges Defendant's unauthorized use of Plaintiff's computers in violation of the CFAA.  Specifically, Plaintiff alleges that Defendant, through individuals working on its behalf, including but not limited to its former employees, knowingly, intentionally, and with the intent to defraud Plaintiff, accessed Plaintiff's computers without authorization in an effort to download, copy, transfer, or in some manner obtain files, documents, spreadsheets, programs, code, macros, and/or electronically stored information containing Plaintiff's Confidential Information.  (Am. Compl. ¶ 148.)  Defendant argues that Plaintiff fails to state a claim for relief under the CFAA because Plaintiff does not plausibly allege that Defendant accessed its computers and also fails to plead losses sufficient to establish a CFAA claim.  (Moving Br. at 23–27.)

To state a civil CFAA claim, Plaintiff must establish that "(1) Defendant has accessed a 'protected computer'; (2) has done so without authorization or by exceeding authorization as was granted; (3) has done so 'knowingly' and with 'intent to defraud'; and (4) as a result has 'further[ed] the intended fraud and obtain[ed] anything of value.'"  *P.C. Yonkers, Inc. v. Celebrations the Party and Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005) (quoting 18 U.S.C. § 1030(a)(4)).  The damage or loss caused by the unauthorized access must exceed $5,000. *See* 18 U.S.C. § 1030(a)(4).

Defendant argues that Plaintiff fails to allege that Defendant ever actually accessed Plaintiff's computer systems.  (Moving Br. at 24.)  Defendant however, is mistaken.

Plaintiff alleges with specificity that Defendant accessed its protected computer systems in violation of the CFAA.  Plaintiff alleges that Wampler, acting as Defendant's agent, directed Plaintiff's employees "to back up and synchronize their computers to the PRMG corporate

13

information technology system, to ensure that that the Former PRMG Employees would have access to and would be able to misappropriate all of the most recent and updated PRMG Confidential Information in the hours before they stopped working for PRMG." (Am. Compl. ¶ 63.) Plaintiff also alleges that after the computers were synchronized and backed up, Defendant's employee called each of the individual employees. (*Id.* ¶ 68.) Plaintiff next alleges that, during the calls, Defendant's employee sent the employees a hyperlink that, when clicked, gave Defendant direct access to the computers and Defendant accessed Plaintiff's computers. (*Id.*) As a result, Plaintiff alleges that Defendant—without authorization—accessed all Confidential Information contained on Plaintiff's computer systems. *Id.*

Courts in the Third Circuit—along with other district courts outside the Third Circuit— have consistently held that the act of directing an employee to access a computer system on Defendant's behalf, establishes liability under the CFAA. *See Synthes, Inc. v. Emerge Medical, Inc.*, Civ. No. 11-1566, 2012 WL 4205476, at *17 (E.D. Pa. Sept. 19, 2012) (denying motion to dismiss CFAA claim because "one's act of inducing another to access a computer that he or she is otherwise not authorized to use constitutes 'access' for purposes of CFAA liability."); *Binary Semantics, Ltd. v. Minitab, Inc.*, Civ. No. 07–1750, 2008 WL 763575, at *6 (M.D. Pa. Mar. 20, 2008) (finding that where employee of plaintiff company acted at the direction of defendant company when she accessed plaintiff company's protected computer to steal trade secrets and provide them to defendant company, the defendant company could be held liable for the CFAA violation); *Charles Schwab & Co., Inc. v. Carter*, 2005 WL 2369815 at *7 (N.D. Ill. Sept. 27, 2005) (denying motion to dismiss CFAA claim against new employer who encouraged employee to access previous employer's computer system because "[t]o hold otherwise would exempt a principal from liability when its agent improperly accessed a computer at the direction of the

14

principal."). Plaintiff's allegations of indirect access by Defendants are therefore enough to meet its burden on this element, but Plaintiff also pleads that Defendant itself knowingly, intentionally, and with the intent to defraud Plaintiff, accessed Plaintiff's computers without authorization. (Am. Compl. ¶ 148.) Accordingly, the Court is easily satisfied that this element has been sufficiently pled. The only remaining element to establish a CFAA claim is for Plaintiff to plead that Defendant's violation caused damage or loss to Plaintiff in excess of $5,000.

Defendant argues that Plaintiff only pleads a loss of business rather than damages associated with the computer or computer system itself. (Moving Br. at 30.) The statute is clear, however, that loss under the CFAA "means any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." *See* 18 U.S.C. § 1030(e)(11). Compensable losses can include "the cost of remedial measures taken to investigate or repair the damage to the computer, or . . . the amount of lost revenue resulting from a plaintiff's inability to utilize the computer while it was inoperable because of a defendant's misfeasance." *Volpe v. Abacus Software Sys. Corp.*, Civ. No. 20-10108, 2021 WL 2451968, at *6 (D.N.J. June 16, 2021) (quoting *Clinton Plumbing & Heating of Trenton, Inc. v. Ciaccio*, Civ. No. 09-2751, 2011 WL 6088611, at *5 (E.D. Pa. Dec. 7, 2011)). A plaintiff can also recover for "damage," defined by the CFAA as "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). In sum, a wronged party can recover "direct costs related to addressing a violation, and consequential damages resulting from an interruption of service." *Teva Pharms. USA, Inc. v. Sandhu*, 29 F. Supp. 3d 659, 672 (E.D. Pa. 2018).

Plaintiff explicitly pleads that it suffered damages in excess of $5,000 as a result of Defendant's unauthorized access to its computer systems. (Am. Compl. ¶ 153.) Plaintiff goes even further, alleging that its damages and losses specifically include the costs of responding to Defendant's unauthorized access to its computer systems such as the investigation of its computer systems, a damage assessment performed by computer forensic experts, and interruptions in service associated with its investigation and assessment. (*Id*.) These specific allegations distinguish the instant case from *Advanced Fluid Sys. v. Huber*, 28 F. Supp. 3d 306 (M.D. Pa. 2014), on which Defendant relies. There, the plaintiff alleged only that it had suffered over $5,000 in damages and did not "include allegations that [the plaintiff] incurred any costs in responding to the conduct, conducting a damage assessment, or restoring any data, programs, or the system to its prior condition." *Id*. at 330. Accordingly, Plaintiff has adequately pled all the elements necessary to establish a CFAA claim. The Court will therefore deny Defendant's Motion to Dismiss Plaintiff's CFAA claim.

### D.   STRIKE ALLEGATION AND EXHIBIT

Finally, Defendant argues that Paragraph 87 of the Amended Complaint, as well as Exhibit D thereto, should be stricken under Federal Rule 12(f), which permits the Court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." (Moving Br. at 33–34.) Paragraph 87 of the Amended Complaint references Plaintiff's cease and desist letter as well as Defendant Counsel Christopher J. Kelly's ("Kelly") response to the cease and desist letter. "Exhibit D" that is attached to the Complaint and Amended Complaint is Kelly's response to the cease and desist letter. Defendant argues that "attaching such correspondence to the Complaint is improper and in direct violation of Rule of Evidence 408 which bars "conduct or a statement made during compromise negotiations about the claim is not admissible—on behalf of

16

any party—either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction." (Moving Br. at 34.)

Rule 12(f) of the Federal Rules of Civil Procedure states that a "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "As a general matter, motions to strike under Rule 12(f) are highly disfavored." *Thompson v. Real Est. Mortg. Network, Inc.*, Civ. No. 11-1494, 2018 WL 4604310, at \*2 (D.N.J. Sept. 24, 2018). Moreover, the decision to strike material from a pleading is discretionary. *F.T.C v. Hope Now Modifications*, Civ. No. 09-1204, 2011 WL 883202, at \*1 (D.N.J. Mar. 10, 2011)). Motions to strike "will generally 'be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues.'" *Garlanger v. Verbeke*, 223 F. Supp. 2d 596, 609 (D.N.J. 2002) (quoting *Tonka Corp. v. Rose Art Indus., Inc.*, 836 F. Supp. 200, 217 (D.N.J. 1993)). "[W]here the challenged material is redundant, immaterial, impertinent, or scandalous, a motion to strike should not be granted unless the presence of the surplusage will prejudice the adverse party." *Hope Now Modifications, LLC*, 2011 WL 883202, at \*1. Moreover, it is clearly established that pursuant to Federal Rule of Evidence 408, evidence of settlement offers may not be used to prove or disprove the validity of a party's claim. *Sinclair Cattle Co. v. Ward*, 80 F. Supp. 3d 553, 557 n.1 (M.D. Pa. 2015).

Here, Defendant does not claim that Plaintiff references and attaches the response to the cease and desist letter to prove or disprove the validity of its claims—nor does the Court view it as an attempt to do so. Instead, Plaintiff is clear that the response to the cease and desist letter was viewed as a challenge to the enforceability of the former employees' Restrictive Covenants Agreements. It does not attempt to infer or impute any legal liability or prove any claim with its

17

reference to Defendant counsel's response letter.  Moreover, Defendant does not claim that the letter's reference is immaterial, impertinent, or scandalous, and Defendant fails to identify how it is prejudiced by the inclusion of the letter.  Accordingly, the Court will deny Defendant's attempt to strike paragraph 87 and Exhibit D of the Amended Complaint.

## IV.  CONCLUSION

For the reasons stated above, the Court will DENY Plaintiff's Motion to Dismiss.  An appropriate Order will follow.

Date: **May 31, 2023**

s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**

18